Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7545 | **DATE** | 3/27/2003 |
| **CASE TITLE** | Worldcom, Inc. vs. Free Paging, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Decision and Order. Defendants' motion for summary judgment [24-1] is denied. WorldCom's motion for summary judgment [20-1] is granted on Counts I, IV, VII and VIII. Counts II, III, V and VI are dismissed as moot. WorldCom is allowed its costs. Defendants are directed by 4/14/03 to submit to this court a proposed judgment order, agreed to in form.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | | MAR 28 2003 date docketed |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | docketing deputy initials |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 03 MAR 28 AM 8:16 | 3/27/2003 date mailed notice |
| MD | courtroom deputy's initials | FILED-ED TO Date/time received in central Clerk's Office | MD mailing deputy initials |

Document Number: 32

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WORLDCOM, INC., d/b/a WORLDCOM TECHNOLOGIES, INC., )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FREE PAGING, INC., GO TELCO, INC. and )<br>JAMES WON )<br>)<br>Defendants. ) | No. 00 C 7545<br>Judge Joan H. Lefkow |

**DOCKETED**
MAR 2 8 2003

## MEMORANDUM DECISION AND ORDER

This case arises from a breakdown of a business relationship between plaintiff, WorldCom, Inc., d/b/a WorldCom Technologies, Inc. ("WorldCom"), and defendants, Free Paging, Inc. ("Free Paging"), Go Telco, Inc. ("Go Telco") and James Won ("Won") (collectively, "defendants") where WorldCom provided telecommunication services for defendants' pre-paid long distance calling cards. WorldCom alleges Free Paging is liable for breach of contract (Count I), promissory estoppel (Count II) and unjust enrichment (Count III). WorldCom alleges the same claims against Go Telco (Counts IV, V and VI, respectively). WorldCom also alleges Won is liable for breach of the Free Paging and Go Telco guaranties (Counts VII and VIII, respectively). WorldCom moves for summary judgment on all claims and defendants move for summary judgment on Counts I, II, III, VII and VIII. Diversity jurisdiction is properly invoked pursuant to 28 U.S.C. § 1332. For the reasons set forth below, the court grants WorldCom's motion and denies defendants' motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

# FACTS

### A. The parties

WorldCom is a Georgia corporation with its principal place of business in Tulsa, Oklahoma. Free Paging and Go Telco are Illinois corporations with their respective principal places of business in Chicago, Illinois. Won is a citizen of Illinois. He is the president and the sole stockholder of Free Paging. He also is the president and a majority owner of Go Telco.

### B. The pre-paid long distance calling card business

Free Paging and Go Telco engage in the business of pre-paid long distance calling cards. From the perspective of a pre-paid calling card company, there are three legs of a long distance call that impose costs: (1) the customer call from the local service to the long distance network; (2) the call traveling over the long distance network; and (3) the call from the long distance network to the local service of the receiver. Defendants had a business plan to minimize the cost of the second leg, which was to bypass the traditional long distance network and use the Internet instead. Defendants would use "voice-over-Internet" technology, where they would purchase and install their own equipment, which would allow the speaker's voice to be digitized, sent over the Internet and "put back together on the other side." (Barnes Dep. at 5.) Defendants would be able to reduce costs by passing calls over the Internet rather than purchasing bulk minutes from traditional long distance carriers such as WorldCom.

Defendants, however, still needed a carrier to provide telecommunication services for the first and third legs of the call, which the parties refer to as "T-1 service." (*Id.* at 31.)[1] With

---

[1] According to Joseph Barnes, Won's business colleague, the Internet also has a T-1 line. (Barnes at 47.) To prevent any confusion, the T-1 lines in this case correspond to WorldCom's service.

respect to the second leg, because there may be an "overflow" of calls on the Internet those calls would need to be re-routed to a traditional long distance network. Furthermore, defendants planned to use the voice-over-Internet technology only between Chicago and the Mexican cities of Monterey and Mexico City and thus they still needed a traditional long distance network for the second leg of calls to other countries.

Sometime around November 1998, Won along with James Barnes ("Barnes"), who was a partial owner/shareholder of Go Telco and a technical consultant or employee on whom Won relied, contacted WorldCom at one of its offices located in Los Angeles, California, to obtain the required telecommunication services on credit. Soon thereafter, the Chicago office for WorldCom contacted Won and Barnes, saying it could give them a better "deal" with the T-1 service. Instead, Won and Barnes waited for their deal with the Los Angeles office to go through. (*Id.* at 40.) Subsequently, they complained to the Chicago office that they were not getting the T-1 service. The Chicago office responded, "those guys out there [(the Los Angeles office)], they don't run Chicago, we run Chicago. You want something done in Chicago, come to the Chicago team." (*Id.* at 42.) Won and Barnes decided to receive T-1 service from the Chicago office but kept alive their order for the T-1 service with the Los Angeles office. (*Id.* at 24, 42-43.)

WorldCom took approximately six months to install the T-1 service. (*Id.* at 73.) Barnes represented in two letters to WorldCom, dated August 9, 1999 and August 23, 1999, respectively, that Go Telco was losing $3,500 a day due to WorldCom's "lagging" in the installation of the T-1 lines. (Def. Mot. Exs. 1 and 2.) Defendants, however, do not provide bank or credit reports indicating this business loss.

C.  **The agreements between the parties and Won's personal guaranties**

1.  *The Free Paging Agreement*

On or about May 19, 1999, WorldCom and Free Paging entered into an agreement entitled, "Option 1 MCI WorldCom On-Net Voice Agreement with FREE PAGING, INC." (Verified Compl. Ex. A, hereinafter referred to as the "Free Paging Agreement.") In the Free Paging Agreement, WorldCom agreed to provide an "On-Net Voice term plan" that included discounts associated with the plan and additional discounts on domestic and international long distance usage charges. Free Paging agreed to meet an annual volume commitment ("AVC") of $120,000 and agreed that WorldCom would assess Free Paging with an underutilization charge in the event that Free Paging failed to meet the AVC. Furthermore, Free Paging would pay WorldCom for its services within 25 days of receipt of the invoice. Free Paging also could not transfer or assign its rights or obligations without WorldCom's prior written consent. Moreover, the Free Paging Agreement provided that all services were governed by Federal Communication Commission ("FCC") tariffs Nos. 1 and 2 as well as any other applicable tariffs.[2] Specifically, under FCC tariff No. 1, section 2.5.3 required Free Paging to cover attorneys' fees, court costs, costs of investigation and other related expenses in WorldCom's attempts to collect charges, and assigned at least a 1.5% per month finance charge assessed against delinquent balances. The Free Paging Agreement also contained an integration provision, providing that the Agreement

---

[2]Under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.*, telecommunications carriers such as WorldCom are required to file with the FCC a schedule of their charges for telecommunications services. *International Telecomm. Exch. Corp. v. MCI Telecomm. Corp.*, 892 F. Supp. 1520, 1539 (N.D. Ga. 1995). 47 U.S.C. § 203(a) provides that WorldCom must file tariffs "showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication . . . and showing the classifications, practices, and regulations affecting such charges." "[T]hese tariffs are not mere contracts, but rather have the force of law." *American Tel. and Telegraph Co. v. New York City Human Res. Admin.*, 833 F. Supp. 962, 970 (S.D.N.Y. 1993).

and the referenced "Attachments" represented "the complete agreement of the parties and supersede[d] any prior agreements or representations, whether oral or written[.]" (Verified Compl. Ex. A at 2.) The Free Paging Agreement further provided that New York law was the applicable choice of law.

From May 1999 to May 2000, WorldCom provided Free Paging with telecommunication services under account numbers 8770073909, 9150022611, 9150022613 and 9150022626.

2. *The purported transfer of the Free Paging account(s) to Go Telco*

In a letter dated August 9, 1999 to WorldCom, Barnes requested that "all accounts and billing be corrected and placed under the GO TELCO name." (Def. Mot. Ex. 1.) In a second letter dated August 23, 1999 to WorldCom, Barnes requested "all GO TELCO accounts be name changed and listed as GO TELCO. Account Numbers #0039020 [*sic*] and #9150096586." (Def. Mot. Ex. 2.) (emphasis in original). WorldCom responded to Go Telco in a letter, referencing a Free Paging account number 9150096586 and writing that WorldCom changed that account from Free Paging to Go Telco. (Def. Mot. Ex. 3.) WorldCom also requested Go Telco to sign and submit a "Change and Continuation Agreement." (*Id.*) The Change and Continuation Agreement stated that:

> Go Telco formerly Free Paging wishes to continue existing contract(s) and agreements with WorldCom and guarantees payment of all present and future invoices to WorldCom as Go Telco. The signature(s) affixed to this agreement represents Go Telco's acceptance and pledge to honor all pre-existing terms and conditions formerly agree to by Free Paging*** . . . and WorldCom . . .

(Def. Mot. Ex. 4.) The "***" referred to "Account(s) 9150096586[.]" (*Id.*) Won signed the document as President of Go Telco and dated it August 27, 1999.

6

## 3. *The Go Telco Agreement*

On or August 25, 1999, Go Telco and WorldCom entered into their own agreement entitled the "MCI WorldCom On-Net Voice Agreement." (Verified Compl. Ex. D at 1, hereinafter referred to as the "Go Telco Agreement.") Although there were some differences between the Free Paging and Go Telco Agreements, as relevant to this case, the Go Telco Agreement set forth essentially the same provisions and attachments as included in the Free Paging Agreement discussed above. From August 1999 through May 2000, WorldCom provided Go Telco with telecommunication services under account number 9150096586.

## 4. *Won's personal guaranties of the Agreements*

The Go Telco and Free Paging Agreements incorporated an "Attachment A - Customer Profile." (Verified Compl. Exs. A at 4-5, D at 3-4.) Both Customer Profiles contained a provision with a heading labeled "Continuing Guarantee of Service." This heading stated that an applicant was required to complete that provision only where WorldCom required a guaranty. Under the heading was the statement: "I personally guarantee payment of account to MCI WorldCom, Inc., executed effective the date below." (Verified Compl. Exs. A at 4, D at 3.) Below the statement was Won's name, his home address and social security number as well as his signature. Both Customer Profiles also contained "Terms and Conditions" that described the guaranty as "a continuing guarantee of payment of all Indebtness owing by Debtor to MCI WorldCom now outstanding and owing or which hereafter may exist or be incurred" and stated that the "Guarantor absolutely and unconditionally guarantees payment of the Indebtness to MCI WorldCom." (Verified Compl. Exs. A at 5, D at 4-5.) Furthermore, the guaranty provision provided, "It shall be conclusively presumed that all extensions of credit and financial

7

accommodations made by MCI WorldCom to Debtor made concurrently herewith or hereafter are made in reliance upon this Guaranty Agreement." (Verified Compl. Exs. A at 5, D at 4.)

Although Won signed the guaranties, Won testified that he never discussed these guaranties with WorldCom. (Won Dep. at 23.) This fact is corroborated by Barnes and WorldCom. (Barnes Dep. at 33; S.J. Moore Aff. Ex. 8, Pl. Resp. to Def. First Request for Admissions at 3.) Moreover, Won points out that WorldCom never requested credit and financial information from him although he admits that, as part of the credit approval process, WorldCom required a financial statement from Free Paging. (Won Dep. at 22-23; see Barnes Dep. at 34-35.) Barnes also testified that WorldCom did not require personal guaranties because defendants received revenues before they incurred usage fees from WorldCom (Barnes Dep. at 56) and thus defendants would be good credit risks. Moreover, defendants point out that with the "dot.com boom" (*Id.* at 73), WorldCom's sales personnel "were tripping over each other to provide service to [them.]" (Def. Resp. at 13.)

**D.     WorldCom's telecommunication services to Free Paging and Go Telco**

*1.     The service problems*

Sometime in October 1999, the T-1 service "was up and running" and customers were using the cards. (Barnes Dep. at 66; Pl. Mem. at 7.) Almost immediately, however, defendants experienced connection problems with the cards. With respect to the second leg, defendants attributed many problems with the cards to WorldCom. For example, overflow calls made up only approximately five percent of voice-over-Internet calls but the calls were not being re-routed to WorldCom's long distance network. (Barnes Dep. at 94, 96-97.) It took WorldCom approximately one week to fix this problem. (*Id.*) At some unspecified point, the long distance

network was disabled because the lines were "cut in half" through no fault of WorldCom's. (*Id.* at 89.) Still, defendants sustained business losses. (*Id.*) At some point, however, defendants experienced an influx of business such that they retained other carriers besides WorldCom to handle the second leg of the calls. With respect to the first leg, a local access number would not work for four hours to two or three days. (*Id.* at 87.) In the meantime, some customers resolved this problem by calling access numbers in other area codes, which created more costs to the customers and defendants. (*Id.* at 86.) This problem occurred approximately once a week. (*Id.*)

Several times, Barnes called WorldCom and completed a "trouble ticket" describing the connection problems. (*Id.* at 82-84.) WorldCom would respond by fixing a T-1 line or a "switch" to a line usually within 24 hours. (*Id.* at 83-84, 87, 89.) Barnes determined that part of this problem involved WorldCom erroneously flipping a switch based on the different encoding system that defendants used to transfer calls through their equipment. (*Id.* at 84-85.) Barnes stated that he kept notes about the connection problems and left them with Go Telco. (*Id.* at 89.) Defendants, however, did not produce these notes in discovery and do not offer them as evidence with respect to the pending motions.

In April or May 2000, Go Telco requested and received records from WorldCom that showed the location of the origination and termination of each call and the duration of the call. According to Barnes, the records showed repeated calls by the same customer trying to get the call through the service. (*Id.* at 68-70, 80.) Each time the customers called, they were charged a connection fee. Defendants did not produce these records in discovery and do not offer them as evidence with respect to the pending motions.

Barnes testified that defendants began to receive calls from customers as well as

9

distributors who sold their cards. The customers complained that the service was not working. The distributors called for refunds for returned cards, which defendants sometimes would honor. (*Id.* at 103-04.) Barnes testified that, at some unspecified point, "every one" of defendants' "hundreds" of distributors refused to sell the cards. (*Id.* at 112.) Defendants, however, were able to identify only three distributors who complained about the cards. (S.M. Sullivan Aff. Ex. H, Def. First Supplemental Resp. to Pl. First Set of Interrogatories at 2.)

2. *WorldCom discontinues its services to defendants*

In July 2000, WorldCom disconnected its telecommunication services to Free Paging and Go Telco for failure to pay amounts owed on their accounts. WorldCom attaches a spreadsheet showing the charges incurred and the payments and credits made on each of the accounts. As of October 2000, the balances owed on the accounts were as follows:

| Account No. 8770073909 | $ 11,776.93 |
| Account No. 9150022611 | $ 48,942.35 |
| Account No. 9150022613 | $  6,780.31 |
| Account No. 9150022626 | $  3,858.34 |
| Account No. 9150096586 | $259,147.68 |
| Total Balance | $330,505.61 |

(Pl. L.R. 56.1 ¶ 38; H.G. Gramlick Aff. Ex. B.) On or about November 30, 2000, WorldCom filed this instant action, seeking to recover its losses based on the Free Paging and Go Telco Agreements and Won's personal guaranties.

## DISCUSSION

**A.  Counts I and IV: breach of contract claims against Free Paging and Go Telco**

The Agreements provide that New York law governs the disputes at issue. *See, e.g., Freund v. E.D. & F. Man Int'l, Inc.*, 199 F.3d 382, 383 (7th Cir. 1999) (applying the law of the

state that the parties agreed controlled the contract). Under New York law, "the objective of contract interpretation is to give effect to the expressed intentions of the parties.... Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989), citing, *inter alia, Hartford Accident & Indem. Co.* v. *Wesolowski*, 33 N.Y. 2d 169, 171-72, 305 N.E. 2d 907 (1973), and *Sutton* v. *East River Sav. Bank*, 55 N.Y. 2d 550, 554, 435 N.E. 2d 1075 (1982).

WorldCom represents that the Free Paging and Go Telco Agreements are valid and enforceable contracts, which defendants breached for failing to pay amounts owed on their accounts. For a breach of contract claim, the plaintiff must show (1) formation of a contract between the plaintiff and the defendant, (2) performance by the plaintiff, (3) the defendant's failure to perform, and (4) resulting damage. *Ledain* v. *Town of Ontario*, 746 N.Y.S. 2d 760, 763 (N.Y. Sup. 2002). WorldCom contends that there is no genuine issue of material fact as to any of these elements of proof: that contracts were formed, that WorldCom performed, that defendants failed to pay as agreed, and that WorldCom was damaged in the amount of $330,505.61. In response, defendants assert that WorldCom "destroyed" their calling card business through its delay in installation and poor service thereafter, and that these factors caused defendants to default on their obligations to pay WorldCom. Rather than asserting a counterclaim for breach of contract or arguing failure to perform (the third element of proof), however, defendants rely on affirmative defenses of failure of consideration and, with respect to Free Paging, release. (Def. Am. Answer and Affirmative Defenses at 32-34.)

*1. Failure of consideration/failure of performance*

Defendants cite no case law or statute in support of their failure of consideration defense, and their theory is a bit puzzling. Defendants phrase their argument such that WorldCom "failed to provide its consideration" under the Agreements. (Def. Resp. at 1.) If they mean by this that WorldCom did not perform (provide) the contracts (consideration), they appear merely to contend that WorldCom has not met its burden to prove the third element, performance. If they mean, on the other hand, a failure of consideration in the sense that nothing of value was received,[3] they cite no New York cases in support, nor does the evidence indicate that no value was received. Further, they do not address the problem that these were executed contracts, thus, as the marginal text in footnote 3 indicates, failure of consideration is not a defense.[4] This court declines to

---

[3] AMERICAN JURISPRUDENCE (2D) Contracts, § 670, describes failure of consideration as follows:

[W]here there is failure of consideration, there is a contract when the agreement is made, but because of some supervening cause the promised performance fails. In any event, . . . failure of consideration is generally an excuse for nonperformance of a promise . . . ." Where there is a total failure of consideration and the defendant has derived no benefit from the contract or none beyond the amount of money which he has already advanced, such total failure of consideration may be shown in bar of the action.

While a failure of consideration imports a breach of contract, not every breach of contract imports a failure of consideration. It has been said that mere inadequacy in the value of the thing bought or paid for is not a want or failure of consideration and that this covers only total worthlessness to all parties or subsequent destruction, total or partial. And it has been decided that the death of a stallion, preventing an exercise of the privilege of return by one who had paid for a fruitless service, with an agreement for the privilege of returning during the season, does not create any failure of consideration which will give a right to repayment.

\* \* \*

A party may not defend against an executed contract on the ground of want of consideration, as the presence or absence of consideration is material only as going to the enforceability of a purported agreement. Once the agreement has been executed, lack of consideration is beside the point and cannot be availed of to upset what has already transpired.

(Footnotes omitted).

[4] WorldCom promised to provide Free Paging and Go Telco with "On-Net Voice" service plans with discounts in domestic and international long distance usage charges. Moreover, Free Paging and Go Telco promised to pay WorldCom for these services. For these reasons, the Agreements clearly express an exchange of

12

research the matter further to ascertain whether defendants might mount a failure of consideration defense under New York law and treats their position as merely disputing WorldCom's threshold element of proof, that it performed its obligations under the contract.

Defendants argue that WorldCom failed to perform in that (1) it delayed in initially installing its services and (2) it failed to adequately transport calls to meet the needs of defendants' customers. With respect to the delay argument, the evidence demonstrates that there was confusion between WorldCom's offices and defendants and that WorldCom was not installing the T-1 lines as quickly as defendants anticipated. But defendants cannot establish that the delay was a failure to perform. Conceding that the Agreements did not impose an obligation to install on or before a particular time, defendants rely on unspecified "oral commitments" but do not suggest how such oral commitments might alter the terms of the Agreements. *See Petracca v. Petracca*, ___ N.Y.S. 2d ___, 2003 N.Y. Slip Op. 11571, at *2 (2 Dept. 2003) ("extrinsic or parol evidence is not admissible to create an ambiguity in a written agreement that is otherwise clear and unambiguous"). Neither do defendants argue or submit proof of failure to install within a reasonable time. *See Pfuntner v. Lyons*, 742 N.Y.S. 2d 462, 464, 294 A.D.2d 947, 948 (4th Dept. 2002) ("It is well established that, when a contract does not specify time of performance, the law implies a reasonable time) (internal citations and quotations omitted).

With respect to the failure to transport service argument, defendants assert that the connection problems caused defendants' business to collapse within its first few months because customers failed to buy new pre-paid calling cards and defendants met demands for extensive refunds. Defendants rely on the testimony of Barnes, who described all the problems defendants

---

consideration.

13

had with WorldCom, as set out more fully above. *See* facts *supra* pages 8-10. WorldCom points to considerable evidence favorable to it, such as Barnes' concession that 95% of defendants' overflow calls were unaffected by the switch problem, that defendants' used numerous providers besides WorldCom to handle incoming calls for their customers, and that defendants have no evidence that problems were not caused by their own equipment, by other providers' equipment or events beyond WorldCom's control such as when some lines were cut in half.

Although there is certainly a dispute of fact as to WorldCom's performance under the Agreements, the issue here is whether there is sufficient evidence of defendants' position to go to the jury. Despite their broad claims, defendants rely virtually entirely on the oral testimony of Barnes to rebut WorldCom's evidence of performance. As WorldCom points out, defendants have no documentary evidence of customer complaints and service requests (although Barnes said he kept notes), they have not produced documentary evidence of the claimed multiple charges for failed connections or business, or bank or credit report records that would demonstrate that WorldCom's performance was so deficient that it caused defendants' business to fail. (In response, defendants state that "they are not in possession of those records" but offer no reasonable explanation for why they could not have obtained these records.) Defendants have no expert witness who testified that the level of problems that defendants experienced was materially below a standard of performance in this particular industry. Thus, the court is left with the testimony of an investor and technical consultant who helped Won establish a pre-paid calling card business as evidence that the terms of the Free Paging and Go Telco Agreements were not fulfilled. In the circumstances of this complex field of telecommunications, these mere assertions are simply insufficient to create a genuine issue of material fact. *Accord Slowiak v. Land*

*O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993), quoting *Karazanos* v. *Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) ("[S]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment. . . . '[A party's] speculation is not a sufficient defense to a summary judgment motion'").

2. *Free Paging's liability*

Free Paging moves for summary judgment on all claims against it on the grounds that WorldCom released Free Paging from liability when it entered into the Go Telco Agreement. In support of its motion, Free Paging relies on the two letters from Barnes to WorldCom requesting an account name change, a response letter from WorldCom and the Change and Continuation Agreement. (Def. Mot. Exs. 1, 2, 3 and 4.)

Free Paging cites no authority for its argument that WorldCom released it from liability. Moreover, defendants admit that WorldCom provided Free Paging with telecommunication services under account numbers 8770073909, 9150022611, 9150022613 and 9150022626 from May 1999 to May 2000. (Def. Resp. to Pl. L.R. 56.1 ¶ 30.) Nevertheless, WorldCom addresses Free Paging's argument, interpreting it as an assertion that a novation took place, citing, *inter alia*, *Schuster* v. *Dragone Classic Motor Cars, Inc.*, 104 F. Supp. 2d 276, 279 (S.D.N.Y. 2000) (a novation requires "(1) a previously valid obligation, (2) agreement of all parties to a new contract, (3) extinguishment of the old contract, and (4) a legally valid new contract.").

Pursuant to the assignment provision in the Free Paging Agreement, Barnes' second letter, the Change and Continuing Agreement and defendants' admission all point to a transfer of account number 9150096586 from Free Paging to Go Telco even though Barnes insists on an account change for "all accounts" in his first letter. Arguably, this evidence along with the

15

subsequent Go Telco Agreement represents a novation with respect to account number 9150096586. There is, however, no evidence that the Free Paging Agreement was extinguished with respect to the remaining accounts. As such, WorldCom did not release Free Paging from liability.

Accordingly, the court will grant summary judgment in favor of WorldCom on the breach of contract claims in Counts I and IV.[5]

## B. Counts VII and VIII: Won's liability for breach of the personal guaranties

WorldCom asserts that even if it cannot recover under its respective Agreements with Free Paging and Go Telco, it may recover against Won subject to his personal guaranties. WorldCom asserts that the guaranties are "clear and unambiguous" and that Won has "no colorable defense to [his] obligations" under the guaranties. (Pl. Mem. at 10.)

"In the face of the clear and unambiguous language of the guarantee agreement, [the guarantor] is precluded from introducing extrinsic evidence of the parties' intent to diminish his obligation under the guarantee agreement and to contradict its terms[.]" *Norstar Bank of Long Island* v. *Prompt Process Serv., Inc.*, 498 N.Y.S. 2d 61, 62, 117 A.D. 2d 589, 590 (2d Dept.

---

[5]WorldCom also moves for summary judgment on its promissory estoppel and unjust enrichment claims. Promissory estoppel applies to cases, unlike this one, where the contract is not supported by consideration. *Hyatt Corp.* v. *Women's Intern. Bowling Congress, Inc.*, 80 F. Supp. 2d 88, 99-100 (W.D.N.Y. 1999) ("The doctrine of promissory estoppel is to avoid the harsh results of allowing the promisor in such a case to repudiate, when the promisee has acted in reliance upon the promise. As such, promissory estoppel may substitute for consideration, otherwise lacking, thus creating a binding contract.") (internal citations and quotations omitted). Unjust enrichment is a claim in equity. *See Clark* v. *Daby*, 751 N.Y.S. 2d 622, 623, 300 A.D. 2d 732 (3d Dept. 2002) ("To prevail on a claim of unjust enrichment, a plaintiff must show that (1) defendant was enriched (2) at plaintiff's expense, and (3) that it is against equity and good conscience to permit defendant to retain what is sought to be recovered") (internal citations and quotations omitted); *see also Profit* v. *Baum*, No.3:96CV1205 JCH, 2000 WL 502697, at *8 (D. Conn. Mar. 21, 2000) (determining that because the plaintiff prevailed on the breach of contract claim, the second claim "alleging unjust enrichment is superfluous" and rendering the second claim moot). Because the court will grant summary judgment in favor of WorldCom on the breach of contract claims, the court will dismiss as moot the promissory estoppel claims under Counts II and IV and unjust enrichment claims under Counts III and V.

1986). As a general rule, "the signor of a written agreement is conclusively bound by its terms unless there is a showing of fraud, duress or some wrongful act on the part of any party to the contract[.]" *State Bank of India, New York Branch v. Patel*, 561 N.Y.S. 2d 740, 741, 167 A.D. 2d 242, 243 (1st Dept. 1990) (internal citations and quotations omitted).

Won disputes the clear and unambiguous language of the personal guaranties. Won argues that the "Continuing Guarantee of Service" he signed under the respective Customer Profiles was not incorporated in the Agreements and that the "Terms and Conditions" do not demonstrate that he was subject to liability. Furthermore, Won asserts that WorldCom did not rely on the guaranties to enter into the Agreements based on evidence that WorldCom did not discuss the need for personal guaranties with Won and based on Barnes' testimony that Free Paging and Go Telco were perceived as good credit risks.

Courts have consistently and thoroughly rejected arguments similar to those Won makes concerning his liability under the personal guaranties. *See, e.g., Chase Lincoln First Bank, N.A. v. Mark Homes, Inc.*, 566 N.Y.S. 2d 149, 170 A.D. 2d 995, 996 (4th Dept. 1991) (holding the guarantor's claims that he failed to read the document, that he was never informed that he was signing a personal guaranty and that the legal implications of the document were never explained to him were insufficient to overcome the creditor's motion for summary judgment); *Marine Midland Bank, N.A. v. Idar Gem Distrib., Inc.*, 519 N.Y.S. 2d 898, 899, 133 A.D. 2d 525, 526 (4th Dept. 1987) ("A party to a writing is presumed to have read and understood the document which he signed. . . . [The guarantor's] allegation that he signed a document clearly captioned "Unlimited Continuing Guaranty" without understanding the character of the document is wholly insufficient to establish a legal defense."). The Free Paging and Go Telco Agreements contained

17

an integration provision that incorporated the Customer Profiles. The "Continuing Guarantee of Service" in the Customer Profiles explicitly stated that Won was not to complete that provision unless WorldCom required a personal guaranty. Moreover, the "Terms and Conditions" that followed set forth that the guaranties are continuing, absolute and unconditional. Clearly, Won is bound by the terms and conditions of the personal guaranties.

With respect to WorldCom's lack of reliance on Won's guaranties, this assertion is without merit. Both guaranties include a provision that WorldCom relied on the guaranties when it provided "all extensions of credit and financial accommodations" to Free Paging and Go Telco. (Verified Compl. Exs. A at 5, D at 4.) In any event, WorldCom, as part of its credit approval process, required a financial statement from Free Paging. (Won Dep. at 22-23.) Won was the sole owner of Free Paging and thus, to a substantial extent, WorldCom had Won's financial information.

Accordingly, the court will grant summary judgment in favor of WorldCom on Counts VII and VIII.

## ORDER

For the reasons set forth above, defendants' motion for summary judgment [#24] is denied. WorldCom's motion for summary judgment [#20] is granted on Counts I, IV, VII and VIII. Counts II, III, V and VI are dismissed as moot. Worldcom is allowed its costs. Defendants are directed by April 14, 2003 to submit to this court a proposed judgment order, agreed to in form.

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Date: March 27, 2003